**Gordon HATTON, Plaintiff,**

v.

**STATE FARM MUTUAL INSURANCE COMPANY, Defendant.**

No. C-3-80-162.

United States District Court, S. D. Ohio, W. D.

Aug. 31, 1981.

834

Patrick W. Allen, Dayton, Ohio, for plaintiff.

Robert C. Alexander, Neil Freund, Dayton, Ohio, for defendant.

## DECISION AND ENTRY CONDITIONALLY OVERRULING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; FURTHER PROCEDURES ORDERED OF COUNSEL

RICE, District Judge.

### I. Introduction

This matter is before the Court on the motion of the Defendant State Farm Mutual Insurance Company (hereinafter State Farm) seeking Summary Judgment on Plaintiff's First Claim for Relief, pursuant to Fed.R.Civ.Pro. 56. On April 8, 1980, Gordon Hatton filed a complaint against State Farm in the Montgomery County Court of Common Pleas, requesting damages for negligence and breach of contract. Defendant filed a petition for removal to this Court on April 29, 1980, based on diversity of citizenship, and Plaintiff has made no objection to removal.

In Plaintiff's First Claim for Relief, he alleged that he had been an employee of the State Farm Mutual Automobile Insurance Company from June, 1968, to April 3, 1979, and that as part of his compensation, the Defendant provided coverage for accidental death and dismemberment under a group insurance plan known as Group Accidental Death and Dismemberment, Policy No. H600001 (hereinafter A.D.&.D. Policy). Among other benefits, the plan provided for permanent and total disability benefits when a plan member became disabled as a result of an accidental injury. Plaintiff was involved in a motor vehicle accident in April, 1978, which has resulted in his disability and confinement to a wheelchair. Plaintiff also alleged that between the time of his accident and the termination of his employment, the Defendant increased the amount of his effective disability coverage from $50,000 to $62,500, but failed to notify him that he could further increase the amount of his disability coverage to a maximum of $125,000. Accordingly, Plaintiff has asked that he be awarded the additional amount to which he would have been entitled, absent the negligence of and breach of contract by, Defendant.

On January 22, 1981, the Defendant filed a Motion for Summary Judgment with respect to this claim for relief, contending that the date for determining the benefits available to Plaintiff was the date of his accident, and that he could not have increased his coverage after that time. In the alternative, Defendant has argued that:

(1) the enrollment brochures accompanying the group disability policy required that an employee be actively at work for coverage to become effective; and (2) since Plaintiff did not return to active employment after his accident, he was not actively at work under the meaning of the policy, so as to be permitted to increase his coverage.

Plaintiff replied to Defendant's Motion on March 2, 1981, indicating that genuine issues of material fact existed with regard to the nature of his employment status. First, Plaintiff contended that the brochure for Accidental Death and Dismemberment Policy is ambiguous because it utilizes two definitions of employee, by first stating that an employee is defined as a full-time employee, and by then requiring that an employee be actively at work for coverage to become effective. Because of this ambiguity, Plaintiff claims that the contract must be construed against the Defendant to permit Plaintiff to recover if he can establish that he was a full-time employee after his accident. Alternatively, the Plaintiff has argued that if the definition of actively at work must be utilized, he can be considered to have been an active employee because of the continuing nature of the employment relationship, and also because he was not determined to be disabled under the policy until April, 1979.

Subsequent to the submission of the above memoranda, the Court filed an entry on April 6, 1981, noting that the Motion was not appropriate for determination, due to the failure of the parties to submit various items in a form required by Fed.R.Civ.Pro. 56. The Court outlined the items to which it referred, and permitted counsel twenty-one days to supplement the materials as directed. The Court also indicated that should the materials not be submitted, the Defendant's motion would be overruled based on the present state of the file. In that entry, the Court also stated that the parties had failed to indicate why brochures issued in 1978 and 1979, after the formation of the insurance contract, could have been intended to be part of that agreement.

At this point, the Court notes that some of the materials submitted are still not in the form required by Fed.R.Civ.Pro. 56. First, although the affidavit of Robert Fedden, submitted by Defendant on April 23, 1980, stipulates that the Accidental Death Area [sic] Dismemberment Policy, the brochures dated January 1, 1978, and January 1, 1979, and the brochure entitled "Benefits," all attached to the Plaintiff's complaint, are true copies of the papers issued by State Farm to Defendant, no such copies were attached to the complaint when this case was removed to Federal Court. In addition, Plaintiff has submitted a group of eighteen exhibits, none of which is in the form required by Rule 56. The Court has been able to ascertain from the contents of the exhibits submitted by the Plaintiff that the documents therein are most likely what Plaintiff has represented them to be. Accordingly, in light of the proximity of the trial scheduled for this action, the Court has assumed that the documents and exhibits have been certified in the manner specified by Fed.R.Civ.Pro. 56(e). However, the Court's speculation, no matter how well-founded, is not an appropriate substitute for compliance with the Federal Rules of Civil Procedure, and the Court once again orders counsel for Defendant and Plaintiff to submit the materials necessary for resolution of this matter in the form mandated by Rule 56, within fourteen days of notice of this entry. If counsel herein wonder why the Court is requiring such an exercise shortly before trial, the answer must be that this case should be in a proper procedural posture in the event that an appeal is taken from the determinations made by this Court. With the above assumption in mind, then, the Court now turns to consideration of: (1) the general legal principles applicable herein; (2) the undisputed facts of this case; and (3) an analysis of whether, under the facts and law as presented, the Defendant is entitled to summary judgment as a matter of law.

II. *General Principles of Law*

Before the Court addresses the facts pertinent herein, a short recitation of the stan-

dards applicable to Defendant's Motion would be in order. Fed.R. of Civ.Pro. 56(e) provides, with respect to summary judgment, that:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.

The rule is well established that in determining whether summary judgment is appropriate, "the pleadings are to be liberally construed in favor of the party opposing the motion," . . . and "the court is required to take the view most favorable to the party opposing the motion, giving that party the benefit of all favorable inferences that may be drawn from the evidence." *McHenry v. Ford Motor Co.*, 269 F.2d 18, 22 (6th Cir. 1959) (citations omitted).

■ Because the present case is a diversity action, based upon the provisions of an insurance contract entered into by the parties, the Court must determine what law is properly applicable. The Supreme Court ruled in *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that in a diversity of citizenship case, a federal court is required to apply the conflict of laws rules of the state in which the federal court sits. *Id.* at 496, 61 S.Ct. at 1021 [following *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 74–77, 58 S.Ct. 817, 820–822, 82 L.Ed. 1188 (1938)]. The insurance policy in question was executed in Illinois (A.D.&D. Policy, p. 11), but the insured party under the contract, was an Ohio resident, Gordon Hatton. With regard to the law applicable to contracts, Ohio has followed the rule that "[t]he validity and interpretation of a contract are governed by the laws of the state where such contract is made or is to be performed," *Alropa Corp. v. Kirchwehm*, 138 Ohio St. 30, 33 N.E.2d 655 (1941), appeal dism'd for want to substantial federal question, 313 U.S. 549, 61 S.Ct. 1120, 85 L.Ed. 1514 (1941) (quoting from syllabus). However, since neither party herein has contested the applicability of Ohio law, or advanced by proof or pleading that Ohio law differs in any respect from Illinois law, Ohio courts would also hold that there is a presumption that "the law of the place where a contract was executed is the same as the law where enforcement thereof is sought." *Mendelson v. Mendelson*, 123 Ohio St. 11, 173 N.E. 615 (1930) (quoting from syllabus). Thus, there appears to be no barrier to the application of Ohio law to this case.

■ Even assuming such a barrier, the Ohio Supreme Court has indicated in the specific context of a contract for insurance, that Ohio law would govern the construction of the contract where an out-of-state corporation was without authority to transact business in Ohio except pursuant to the conditions provided by law, and where it was clear that "by the terms of the policy Ohio law became a part of the contract of insurance." *Keehn v. Hodge Drive-It-Yourself, Inc.*, 146 Ohio St. 45, 51–52, 64 N.E.2d 117, 121 (1945). In Chapter 39 of the Ohio Rev.Code Ann. (Page), Ohio has provided for extensive regulation of the transaction of business in Ohio by foreign and domestic insurance companies. The record in this case does not indicate whether Defendant has been authorized to transact business within this state, but even assuming that State Farm is not so authorized, Ohio Rev.Code Ann. § 3901.17(A) (Page) specifies certain acts which constitute the doing of business in the State of Ohio, several of which, such as receiving premiums on insurance contracts, have obviously been performed by Defendant. Thus, Defendant is subject to the requirements of Chapter 39 of the Revised Code, and would clearly be without authority to transact business in Ohio except pursuant to the provisions contained in that chapter. *See:* Ohio Revised Code Ann. §§ 3909.01; 3923.-02; 3927.01 (Page). In addition, the A.D.&D. Policy issued by Defendant expressed an intention that the law of the state of the insured (herein Ohio), would become a part of the contract, by providing that any policy provisions in conflict with statutes of the state in which the insured

resided would be amended to conform to the requirements of such statutes (A.D.&D. Policy, p. 20). Therefore, under either theory discussed above, Ohio law must be applied to the construction of the contract between State Farm and Gordon Hatton.

### III. *Factual Background*

As previously noted, Plaintiff's complaint alleged breach of contract and negligence by Defendant in that State Farm failed to notify Plaintiff of, and to allow him to elect, the opportunity to increase his maximum disability benefits to $125,000. The pleadings, depositions, affidavits, and other materials on file indicate the undisputed facts herein to be that:

1. Gordon Hatton was employed by State Farm Mutual Automobile Insurance Company from June, 1968, to April 3, 1979 (Answer of State Farm, ¶ 1; Plaintiff's Complaint, ¶ 1);

2. On or about December 16, 1974, Hatton signed and was issued a Group Accidental Death and Dismemberment Policy No. H600001, which became effective January 1, 1975 (Hatton dep., p. 6; A.D.&D. Policy, p. 3);

3. According to the terms of the A.D.&D. Policy, an employee was defined as a "permanent employee." The policy indicated that State Farm employees under age 70 were eligible for insurance, and that an employee became eligible for insurance "on the first day of the month coincident with or next following one month of continuous active service." The policy further provided for an initial enrollment period ending December 31, 1974, with the insurance coverage to become effective January 1, 1975. Employees who did not enroll within 31 days of becoming eligible were permitted to enroll later, for coverage to become effective on the next following January 1st, providing the employee was on that day regularly at work and performing the duties of his occupation (A.D.&D. Policy, pp. 2, 3);

4. Under the A.D.&D. Policy, employees were permitted to select the class of coverage (individual coverage, classes 1 to 19, or family coverage, classes 20–24), and the principal sum of coverage, in amounts ranging from $10,000 to $100,000. Depending upon the Principal Sum selected, the monthly premium for individual coverage would range between $.53 and $5.30, and for family coverage, between $.76 and $7.60. Hatton selected class number nine and a principal sum of $50,000, with a monthly premium of $2.65 (A.D.&D. Policy, pp. 3, 4; Hatton deposition, p. 6);

5. Changes in the class of coverage or the principal sum were permitted to be made by the insured only on an anniversary date of the policy, which for this A.D.&D. Policy was January 1st of each year (A.D.&D. Policy, pp. 1, 3);

6. The A.D.&D. Policy provided three types of coverage, A, B, and C. Coverage C permitted an employee to receive a permanent total disability benefit upon the satisfaction of three conditions: (A) a continuous total disability resulting within thirty days of an accidental injury; (B) the employee's complete inability for the first year of his disability to perform every duty of his occupation; and (C) the employee's complete inability, after one year of continuous total disability, to engage in any occupation or employment for which the employee is fitted by reason of education, training, or experience, for the remainder of his life. (A.D.&D. Policy, pp. 4, 5).

7. The A.D.&D. Policy provided that insurance would terminate on the earlier of several dates, among which was the last day of the month in which the insured terminated employment. The policy also stated that termination or amendment of the policy would be without prejudice to any claim originating prior to the effective date of the termination or amendment (A.D.&D. Policy, pp. 6, 7);

8. The A.D.&D. Policy provided that it constituted the entire contract of insurance, and that the policy could be terminated by the company as of any anniversary date by mailing or delivering to the Policyholder a written notice stating when the termination would be effective (A.D.&D. Policy, pp. 7, 10);

9. On November 17, 1976, the A.D.&D. Policy was amended to provide, following the provision outlined in Item 3 above, that if the employee was not actively at work on the day coverage would become effective, coverage would not become effective until the next day on which the employee was actively at work (Exhibit 10, submitted by Plaintiff);

10. On April 8, 1978, Hatton was involved in a motor vehicle accident which resulted in paralysis of his lower extremities. After this accident, Hatton did not return to work, but was on paid sick leave for 138 working days, and non-paid medical leave for 138 working days, until April 3, 1979, when his employment was terminated (Plaintiff's Complaint, ¶ 5, Answer of State Farm, ¶ 1 [the Court notes that Defendant has failed to deny ¶ 5 of Plaintiff's Complaint; therefore, ¶ 5 is deemed admitted. Fed.R.Civ.Pro. 8(d)]; Motion of State Farm for Summary Judgment);

11. After Hatton's injury, the A.D.&D. Policy was amended on June 22, 1978, to provide that coverage C would be applicable only to full-time employees. This amendment represented a change in wording from insured employees to full-time employees (Plaintiff's Exhibit 11; A.D.&D. Policy, p. 5);

12. On December 8, 1978, the A.D.&D. Policy was amended in two pertinent respects: (A) the definition of employee was changed from permanent employee to full-time employee; (2) the amount of maximum coverage permitted was increased to $125,000. Plaintiff's previous coverage of $50,000 was increased by this amendment to $62,500. The Defendant agreed to send notices of the increased policy limits to its full-time employees on January 1, 1979, but did not notify Plaintiff. (Plaintiff's Complaint, ¶ 6; Answer of State Farm, ¶ 6; A.D.&D. Policy, pp. 2, 4; Plaintiff's Exhibit 12, pp. 1, 2);

13. Plaintiff was not actively at work after his accident on April 8, 1978. (Hatton deposition, p. 25).

In addition to these facts, which provide the basic background necessary for understanding the issues herein, certain other facts and allegations will be referred to during the Court's analysis of the theories presented by Defendant in support of its request for summary judgment.

IV. *Discussion*

■ In the Motion filed by Defendant, the first ground for summary judgment is premised upon the theory that under no circumstances could Plaintiff have increased the amount of his insurance coverage after the date of his accident on April 8, 1978. Although no legal authority or specific provision of the A.D.&D. Policy to this effect has been cited, Defendant's argument appears to be based on the assumption that an insurance policy can never be altered after the occurrence of the act upon which the claim is made. However, the Court notes that under Ohio law, the "language of the policy controls the rights and obligations of the parties." *Weemhoff v. Cincinnati Ins. Co.*, 41 Ohio St.2d 231, 234–235, 325 N.E.2d 239, 242 (1975). An analysis of the A.D.&D. Policy herein reveals no limitation on an employee's ability to increase the amount of his policy coverage, except the provision in the A.D.&D. Policy as originally issued and thereafter not altered, that coverage might be increased only on the anniversary date of the policy. Since the express terms of a contract control, *Jackson v. Metropolitan Life Ins. Co.*, 34 Ohio St.2d 138, 140, 296 N.E.2d 679, 681 (1973), the Court does not find as a matter of law that Plaintiff was precluded by the express terms of the contract from increasing his coverage after the date of his accident on April 8, 1978. In addition, the unreported case of *Bonham v. Babcock & Wilcox Co.*, No. 9830 (Ct.App. Summit County, filed March 18, 1981) indicates support for the proposition that the date of accident, or date of death, does not always operate to freeze the availability of insurance benefits, as in that action, a widow was permitted to recover additional benefits which had been available under a life insurance policy but which had not apparently been applied for prior to the insured's death. *Id.* at 2.

Moreover, to the extent that Defendant would argue that the Plaintiff's ability to select additional coverage would be restricted because of the provision in the A.D.&D. Policy which specified that an employee must be regularly at work on the day coverage would become effective, the Court makes the following observations. First, this provision precedes the paragraph dealing with changes in the class or principal sum of the policy, and there is no indication that the limiting language is intended to apply to both paragraphs. To the contrary, an examination of the eligibility and enrollment provisions reveals that "regularly at work" applies to an insured's *initial enrollment* for coverage. (emphasis added). According to the A.D.&D. Policy, an employee first becomes eligible for insurance coverage "on the first day of the month coincident with or next following one month continuous active service," A.D.&D. Policy, p. 2). Those persons eligible at the time of the issuance of the A.D.&D. Policy by Defendant, were permitted to enroll during an initial enrollment period ending December 31, 1974. Employees who were not then eligible or who later became eligible were given the option either of enrolling *prior* to their eligibility date, in which case the policy would become effective on their eligibility date, or of enrolling within 31 days after the eligibility date, in which case coverage would become effective on the first of the month next following the date of enrollment. Finally, a third enrollment option was granted, which allowed an employee who had not enrolled within 31 days of his eligibility date to enroll later, with coverage to become effective the next January 1st, providing that the person was on that day regularly at work and performing the duties of his occupation. This latter provision is in fact part of the paragraph containing only the third enrollment provision, directly modifies it, and does not even appear to restrict the effectiveness of the first two enrollment options to situations where an employee is regularly at work. Viewed in this context, the requirement that an employee be regularly at work restricts only the ability of an employee to enroll for coverage *after* his eligibility date, and does not relate either to enrollment as otherwise permitted by the contract, or to changes by the insured in his class or principal sum. Although the A.D.&D. Policy was amended in 1976 to separate the phrase "regularly at work" from its original position modifying only the third initial enrollment provision, this amendment did not disturb the order of the provisions in the enrollment and effective date portion of the policy. The provision restricting eligibility to those persons "regularly," or after the amendment, "actively at work," still preceded, and did not modify or appear to relate to the provision permitting an employee to change his class or principal sum of coverage on the anniversary date of the policy. Thus, while an employee may now be required to be actively at work for all three methods of initial methods of enrollment, there is still no indication of an intent to extend this limitation to changes in the policy once an insured has enrolled. (Plaintiff's Exhibit 10, pp. 1, 2).

One final matter remains for discussion, and that is the effect of the definition of "employee" in the A.D.&D. Policy, upon Plaintiff's right to make changes in his coverage on January 1, 1979. Under the policy in effect when Plaintiff enrolled in 1975, and until December 12, 1978, when the definition of employee was changed (Plaintiff's Exhibit 12, p. 3), it was provided that "wherever used in this policy . . . Employee means permanent employee." (A.D.&D. Policy, p. 2). On December 12, 1978, the policy was amended to provide that "Employee means full-time employee." (Plaintiff's Exhibit 12, p. 1). There is some question in this Court's mind whether the amendment is a material alteration in the contract, and if so, whether Plaintiff would be bound by the December, 1978, amendment, absent his knowledge and assent. *J. R. Roberts & Son v. National Ins. Co. of Cinn.,* 2 Ohio App. 463, 470–471 (1914). However, the January 1, 1978, and January 1, 1979, explanatory brochures contain the same definition of employee, i. e., "full-time" (Plaintiff's Exhibit 2, p. 2; Plaintiff's

Exhibit 3, p. 3), so the Court assumes for purposes of determining this motion, that the December 12, 1978, alteration was not intended to materially change the meaning of "employee."

■ The only contractual restriction, then, upon Plaintiff's ability to increase his coverage, was that he must have been a full-time employee. As the contract does not define what a full-time employee is, that phrase is deemed by the Court to be ambiguous. *Cf. Bonham v. Babcock & Wilcox Co.*, No. 9830 (Ct.App. Summit County, filed March 18, 1981) (affirming trial Court's determination that policy definition of active employee as "any person not retired" was ambiguous, *id.* at 6, and permitting insured employee's widow to recover an increase in policy benefits which had occurred after the decedent had left work in 1976 and never returned due to disability. *Id.* 2, 6, 7.) This ambiguity is further reinforced by the A.D.&D. Policy provisions regarding permanent disability benefits, which require, *inter alia*, a one year period of continuous disability before the insured may qualify for permanent disability benefits. (A.D.&D. Policy, pp. 4, 5). These provisions clearly contemplate a time during which an employee will be unable to work, or during which his ability to do so may be in question. At the same time, however, no provision is included which restricts such an employee's option to alter his principal sum or class of coverage during the time in which he may or may not be able to engage in his regular duties. Since ambiguities in contracts of insurance are to be resolved against the insurer, *Edmondson v. Motorists Mutual Insurance Co.*, 48 Ohio St.2d 52, 54, 356 N.E.2d 722, 723 (1976), the Court cannot conclude that the contract prohibited Plaintiff from increasing his coverage after the accident. It must be emphasized that Defendant could have phrased the policy in a manner "to prevent any mistake as to its meaning," *Munchick v. Fidelity & Casualty Ins. Co. of New York*, 2 Ohio St.2d 303, 305, 209 N.E.2d 167, 169 (1965), but failed to do so.

In *Rose v. New York Life Ins. Co.*, 127 Ohio St. 265, 187 N.E. 859 (1933), the Ohio Supreme Court ruled in its syllabus that:

> Where the meaning of a contract of insurance against loss resulting from total and permanent disability can be fully and clearly ascertained from the words of the contract itself, the court may not resort to surrounding circumstances or the conduct of the parties for aid in its interpretation.

*Id.* at 265, 187 N.E. 859. By implication then, the Court may look to the conduct of the parties where the meaning of the contract is not clear. In the present case, the Court finds that insufficient information has been submitted with respect to the conduct of the parties for the Court to make a determination of the meaning of any ambiguous terms in the policy. The portions of the Hatton and Swank depositions which have been submitted contain indications that some representations were made that Plaintiff was a full-time employee, or that he was treated as such by State Farm after his accident.* (Plaintiff's Exhibit 16, pp.

---

* Moreover, even assuming that Plaintiff was not a full-time employee under the contract of insurance, there is some question in the Court's mind with regard to whether State Farm, by its conduct, waived its ability to contest that fact. In *Motz v. Root*, 53 Ohio App. 375, 4 N.E.2d 990 (1934), the Court of Appeals for Summit County defined waiver as follows:

> A waiver is the voluntary surrender or relinquishment of a known legal right by agreement, supported by a consideration, or by a failure to exercise a privilege to claim a right when the acts and conduct connected with such failure are such as to plainly indicate an intention not to claim such right, although no one is misled to his injury by such failure.

*Id.* at 376, 4 N.E.2d 991. While that case did not involve an insurance contract, the *Motz* decision was followed in *Hoffman v. Aetna Life Ins. Co.*, 60 Ohio App. 497, 22 N.E.2d 88 (1938). In the *Hoffman* case, premiums had not been paid as required by the policy, but the insurance company did not notify the policyholder that the policy had lapsed for nonpayment until after the company had received notice of the death of the insured. *Id.* at 499, 22 N.E.2d 89. The Court of Appeals stated, citing *Motz*, that even though there had not been circumstances which constituted a technical estoppel, the insurance company could be held to have waived a provision of its policy permitting termination. *Id.* at 501, 22 N.E.2d 90. Further, in *English v.*

12, 13; Exhibit 17, p. 19). However, on the basis on the record thus far presented, the Court is unable to conclude whether or not Plaintiff was a full-time employee within the meaning of the A.D.&D. Policy, on January 1, 1979.

Based on the preceding analysis, the Court concludes that Defendant is not entitled to judgment as a matter of law on the ground that Plaintiff could not under any circumstances have increased the amount of his disability coverage after the date of his accident, both because the contract terms do not expressly or by implication appear to forbid it, and because there is an issue of fact with regard to whether Plaintiff remained a full-time employee after his accident.

■ As an alternate theory, under which summary judgment would be justified, the Defendant has maintained that Plaintiff could not have changed the limits of his coverage because he was not actively at work at any time after April 8, 1978. Defendant has argued that: (1) the 1978 and 1979 brochures attached to the Complaint require that an employee be actively at work for coverage to become effective; (2) it is undisputed that Plaintiff was not actively at work after his accident; (3) under the ruling in *Jackson v. Metropolitan Life Ins. Co.*, 34 Ohio St.2d 138, 296 N.E.2d 679 (1973) (Jackson), Defendant is entitled to summary judgment as a matter of law. Plaintiff has argued that summary judgment is not appropriate because: (1) there is an ambiguity in the brochures because employee is also defined as a full-time employee; and (2) there is a genuine issue of material fact with regard to whether Plaintiff was a full-time employee during the time in question.

First, the Court notes that both parties have misunderstood the role of the 1978 and 1979 Accidental Death and Dismemberment Brochures. (Plaintiff's Exhibits 2 and 3). Ohio Revised Code Ann. § 3923.12(C)(1) (Page) provides that for group insurance policies such as the present, the policy itself, and other papers not pertinent herein, such as the insurance application, shall contain a

*National Casualty Co.*, 138 Ohio St. 166, 34 N.E.2d 31 (1941), a specific provision in an insurance policy provided that the insurance would not cover any person over the age of sixty-five years of age. *Id.* at 167, 34 N.E.2d 32. The insured in that case had been under the age of sixty-five at the time the policy was originally issued, but had turned sixty-five by the beginning of the renewal year. *Id.* at 168, 34 N.E.2d 33. The Court held that the insurance company, by accepting the premiums on the policy, had waived the condition of age. *Id.* at 169, 34 N.E.2d 33. In particular, the Court stated:

> A party to a contract who, after discovery or knowledge of facts which would entitle him to rescind, treats the contract as a subsisting obligation and leads the other party to believe the contract is still in effect, waives his right to rescind.... Therefore, the receipt and retention of consideration after knowledge that conditions precedent have been broken, constitutes a waiver of such conditions as to withdraw them from the terms of the contract.

*Id.* (citations omitted). In the present case, the factual record is not complete enough to demonstrate conclusively that State Farm waived its right to insist that Hatton was a full-time employee, so the Court makes no comment on the merits of this question. However, there are certain facts which raise the possibility of such

a waiver. For example, State Farm at some point subsequent to the December, 1978, Amendment of the A.D.&D. Policy, did send Hatton a check for $62,500 rather than the $50,000 for which he had contracted. (Hatton deposition, p. 19). This act evidences some intention to treat the contract as still in force, absent some other explanation. In addition, the Company could have exercised its right to terminate the policy as of the anniversary date on January 1, 1979, but apparently did not. (A.D.&D. Policy, p. 10). A further indication of State Farm's waiver could be taken from the fact that the policy provided for automatic lapse upon an employee's termination (A.D.&D. Policy, p. 7). Had State Farm considered Hatton to be a terminated employee as of the date of his accident, or even after his paid sick leave had ended, presumably notice would have been sent to Hatton, stating that the policy was terminated. Significantly, such a termination would not have affected Hatton's right to recover the $50,000 coverage for which he contracted, because the policy stated that termination would not affect a claim originating prior to the effective date of the termination. (A.D.&D. Policy, p. 7). However, because these matters have not been fully explored by counsel, and may well be explained by testimony at trial, the Court makes no ruling on the issue of waiver, beyond noting the possibility of its application herein.

provision that the insurance policy constitutes the entire contract of insurance. The policy issued by State Farm contains such a provision on page seven. Further, Ohio Rev.Code Ann. § 3923.12(C)(2) (Page) also requires the inclusion of a provision in the policy that the insurer will provide summaries of the essential features of the plan to the policyholder for distribution to the insured parties. Again, the A.D.&D. Policy issued by State Farm contains such a provision, on page ten. The A.D.&D. brochures in question were obviously provided pursuant to the pertinent provisions of the contract and Ohio law, and cannot be considered as affecting or modifying the status of a party insured under that contract, particularly since the contract stated that it constituted the entire agreement. For this reason alone, unless there is a provision in the policy limiting the opportunity to increase coverage to those persons actively at work, *Jackson* would not dictate the outcome of this matter. Since the Court has previously concluded that no such provision is present in the insurance contract, no other analysis is required. Therefore, since the question of whether Plaintiff was a full-time employee on January 1, 1979, is the pertinent issue herein, and since genuine issues of material fact exist with regard to that matter, Defendant is not entitled to summary judgment on his alternate theory that Plaintiff was not actively at work on January 1, 1979.

### V. *Conclusion*

Based on the foregoing analysis of fact and law, the Court concludes that genuine issues of material fact exist, and therefore, Defendant is not entitled to summary judgment as a matter of law. Accordingly, Defendant's Motion for Summary Judgment is conditionally overruled, with the entry of a final order being conditioned upon the submission by the parties of proper Fed.R.Civ. 56 materials within fourteen days of notice of this order.